E-FILED
Monday, 20 August, 2018 04:25:33 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | |
|---|---|
| Kewu Zhan, | ) |
| Plaintiff, | ) No.: _____ |
| v. | ) |
| Patrick F. Hogan; | ) |
| CMB Export Infrastructure | ) |
| Investment Group 48 LP; | ) |
| CMB Export LLC; | ) |
| CMB Illinois Regional Center LLC | ) |
| d/b/a CMB Regional Centers; | ) Judge/ |
| NK Immigration Services LLC, | ) Magistrate: |
| Defendants. | ) |

## COMPLAINT FOR RESCISSION

Plaintiff is a Chinese citizen who is a limited partner in a fund that is sponsored, managed and controlled by Defendant Patrick F. Hogan. He wants to rescind his investment and get a return of his money.

The Fund raised $450,000,000 from 900 investors who paid $550,000 each. The investors were predominately non-accredited Chinese citizens who can barely read English. The ostensible purpose of the Fund was to loan all its money to a developer in Los Angeles to renovate the Century Plaza. The Fund documents – in English -- tell investors they won't recoup their subscription money and that after $50,000 in administrative fees are taken by Hogan and his affiliates, the remaining $500,000 will likely lose money or gain a maximum of ██%, while Hogan draws a █% management fee plus ██% from the developer, and associated other fees.

Hogan misrepresents that limited partnership interests are not "securities" covered by the protections of federal law. Meanwhile, Hogan draws brokerage fees that exceed any possible gain by the investors.

The Defendants failed to register the Fund as an investment company under the Investment Company Act of 1940; failed to register as a broker-dealer under the Exchange Act of 1934; took referrals (including Plaintiff) from attorneys disbarred by the SEC; and misrepresented that a limited partner interest isn't a "security" which is protected by federal and state law. Worse, the nominal investment was 6 years, but (as explained below) immigration backlogs known to the Defendants but not specifically disclosed to Plaintiff makes the duration closer to 15 years. This means that Plaintiff and other investors will sit powerless in China while their money is siphoned off by Hogan, and will not get their money back until, or if, they are approved for citizenship, however long that takes. Plaintiff Zhan is now in his 60s; he may die while his investment is tied up indefinitely with Hogan.

This is the latest in a long line of federal cases on so-called "EB-5 projects." To summarize the EB-5 program, the United States Customs and Immigration Service ("USCIS") has authorized that foreigners who invest $500,000 in certain economically troubled areas can obtain conditional residence in the United States if their money creates 10 jobs. The USCIS allows the designation of "regional centers" to help with paperwork, and to document the job creation process. The regional centers use Chinese 'finders' (unlicensed brokers) who recruit investors in lavish productions with lofty promises in Chinese. The paperwork sent to the investors disclaims everything in English that was promised in Chinese. Typically, investors

2

are told that they are making a 5-7 year investment, when in fact the promoters know, but don't tell the investors directly, that the money must stay in America – and NOT get returned to the Chinese – for 10-15 years while the investor seeks residency approval, during which time the regional center (in this case, the Hogan entities) can deploy, redeploy, reinvest and keep drawing fees from the money. The EB-5 funds that recruit Chinese investors regularly hide the true extent of the backlog, otherwise the Chinese would never invest. And once the Chinese actually invest, the money is practically 'free' since the interest paid to them is so minimal, so delayed, and accrues so slowly, and is subject to so many fees, that the Chinese money is a piggy bank or a piñata for EB-5 fund sponsors and developers.

EB-5 fraud is so rampant that Senators Grassley, Feinstein, Durbin, and others have introduced legislation to end the program. The SEC is stretched thin putting out fires all over the country due to massive abuses and failures to make the required securities filings. The promise of 'free money from China' is too tempting for abuse.

### Jurisdiction and Venue

1.     Jurisdiction is proper in federal court pursuant to 28 U.S.C. 1332(a)(2) because this is a civil matter, in excess of the statutory minimum, between subjects of a foreign state (The People's Republic of China) and citizens and entities of the United States.

2.     Jurisdiction is also proper in federal court pursuant to 28 U.S.C. 1331 because this action involves a question of federal law, namely whether the

Defendants violated the Investment Company Act of 1940 and the Exchange Act of 1934.

3.      Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(2) as all Defendant entities are either registered in Illinois or qualified to do business in Illinois. All have their principal offices in Rock Island, and their CEO and other officers are located in Rock Island. All of the Defendants have significant contacts with this district.

4.      Declaratory relief is authorized under 28 U.S.C. § 2201. A declaration of law is necessary and appropriate to determine the respective rights and duties of parties to this action.

## The Parties

5.      Plaintiff Kewu Zhan is a Chinese national.

6.      Defendant Patrick F. Hogan ("Hogan") was at all times relevant hereto a resident of this district.

7.      Defendant CMB Export LLC was at all times relevant hereto a California company registered to do business in Illinois at 7819 42nd Street West, Rock Island, Illinois.

8.      Defendant NK Immigration Services LLC was at all times relevant hereto an Illinois company at 7819 42nd Street West, in Rock Island, Illinois.

9.      Defendant CMB Illinois Regional Center LLC was at all time relevant hereto an Illinois company using the assumed name CMB Regional Centers at 7819 42nd Street West, in Rock Island, Illinois.

4

10. Defendant "Fund" ("CMB Export Infrastructure Investment Group 48, LP," a Delaware limited partnership) is at 7819 42nd Street West, in Rock Island.

11. The Fund has two co-general partners, namely CMB Export LLC which is registered to do business in Illinois at 7819 42nd Street West, Rock Island, and NK Immigration Services LLC, an Illinois company at 7819 42nd Street West, Rock Island.

12. Defendant Hogan is the manager of Defendants CMB Export LLC, NK Immigration Services LLC, Illinois Regional Center LLC (assumed name CMB Regional Centers), and is the manager of the Fund itself, at 7819 42nd Street West, Rock Island.

13. In effect, Hogan controls all the Defendants.

14. It must be noted that Plaintiff cannot name every party affiliated with Hogan in this transaction because – like some kind of shell game – Hogan is in the process of forming, merging, and dissolving companies – and has many of these EB-5 deals going all over the country. Several of the Defendants whose names appear on the offering materials have already been "merged," or gone "inactive," or otherwise morphed --- all without notice to Plaintiff, so there is no way to follow the trail.

15. To make matters worse, the offering memorandum reads like a Rube Goldberg contraption of circular companies:

> The Borrower is CPMB LLC.
>
> The Owner of the Borrower is ██████████████.
>
> The Project Owner is Next Century LLC.

5

The Owner of the Project Owner is CPMB LLC.

This means the Owner of the Project Owner is also the Borrower.

The Guarantor is ███████████████████.

This means that the Guarantor is also the Owner of the Borrower, who – you will recall – is different from the Project Owner or the Owner of the Project Owner.

The General Partner (note the singular noun) is actually two entities.

One of the general partner, or rather one of the "co-general partners" is  NK Immigration Services LLC, which is not active and is listed as "merged" according to the Illinois Secretary of State.

The "Regional Center" is CMB Export LLC which doesn't have the words 'Regional Center' in it.  But Hogan has (or had) another entity with the word "Regional Center" in it, but it isn't the regional center here -- in fact, that entity is the assumed name "CMB Regional Centers" which is an Illinois assumed name that is listed with the Secretary of State as "inactive."

The Fund is "syndicated" by the General Partner (which is actually two entities, one of which is "merged") and also syndicated by a Swiss affiliate called CMB Swiss Co GmbH ("CMB Swiss") that is owned by another Swiss holding company, and it recruits foreign investors through various Chinese 'finders' (unlicensed brokers) and refers them to Defendants for investment in the Fund.

The Swiss corporate registry leads from CMB Swiss Co GmbH back to Hogan as manager.

Plaintiff believes that this confusion is a deliberate attempt to obfuscate the real

6

parties in interest.

## Factual Allegations

15.     Patrick Hogan set up the Fund – one of many in a series that he has set up – as a source of low-interest subordinated capital for real estate developers.

16.     By way of background, subordinated financing on a real estate development is typically very expensive (in other words, it commands a high interest rate) because it is not fully secured to the same extent as a senior loan that has a first lien on real property.  American banks will require a high interest rate if they are going to make a subordinated loan.

17.     After the financial crisis of 2008, banks were skittish to make development loans unless fully secured by real estate.  Subordinated financing commanded an even higher rate of interest, or was impossible to obtain.

18.     Hogan and others across the country sought to fill this gap by tapping the USCIS' EB-5 program, which had previously been used for small rural projects. They decided to morph the EB-5 program into massive lending entities composed of foreign (mostly Chinese) investors who were corralled into giant funds that would make subordinated loans to developers at a low rate of interest, motivated by the promise of qualifying for eventual residency in the United States.

19.     Hogan set up a regional center under the USCIS, affiliated it with Chinese 'finders' and set up a Swiss affiliate to refer investors; as a result, Chinese investors were recruited to purchase limited partnership interests in the Fund for $550,000, of which $50,000 was an administrative fee they would never see again,

leaving a $500,000 investment in a limited partnership run by Hogan.

20.    Plaintiff Zhan was recruited into the Fund while in China.  He was recruited, like some other investors, by the immigration law firm of Hui Feng, whom the SEC has since barred from the securities industry for EB-5 fraud. The SEC found that Feng was recommending EB-5 projects without disclosing to clients the referral fees he was getting from the regional centers.  *In the Matter of Hui Feng* (March 12, 2018)(banning a lawyer for unlicensed broker-dealer activity in connection with steering clients into certain EB-5 funds).

21.    Other investors were referred by immigration lawyer Jason Lee, who was sanctioned by the SEC for operating as an unlicensed broker-dealer in taking money from regional centers for recommending EB-5 projects.  *In the Matter of Jason Lee* (May 10, 2018).

22.    Plaintiff Zhan received only 21 pages of the investment documents before making his investment – he got a few pages plus the signature pages. He later got the full package after CMB countersigned, and the entire countersigned package was sent to him through his immigration lawyers. Zhan does not read or speak English, and no translated documents were ever sent to him, only verbal instruction from his now SEC-barred attorney.

23.    The marketing brochure of his immigration attorney said that the process of investing and getting a conditional residence in the United States would be one year, and Zhan relied on that assurance.

8

24. The investment documents include the PPM (Exhibit 1), which attached a Subscription Agreement; a Limited Partnership Agreement; and a Loan Agreement. This pdf is 310 pages of dense English.

25. By late 2017, Zhan came to find out that the immigration backlog would extend his immigration process to 10 or more years – which is something that he could not simply afford as a retiree in his 60s: this deal was simply not suitable for a person of advanced age, and he never should have been allowed to invest. He had no idea why no one ever told him about this massive delay. No one had ever checked his assets to see if he was accredited, no one had checked his source of income, and no one had determined if the investment was suitable for him.

26. Zhan contacted CMB to get a return of his investment, but CMB Regional Center officer Kraig Schwigen refused; Zhan also requested copies of all subscription documents submitted to USCIS on his behalf, and CMB refused.

27. Zhan retained Illinois counsel to again demand a return of his investment from Mr. Schwigen on the grounds that the offering violated federal and state laws. Mr. Schwigen again refused to return the 1/900th interest in the Fund to this retired man.

28. It now appears that Plaintiff Zhan will die in China of old age while waiting for his investment to be returned to him, if ever.

## COUNT I
### 15 U.S.C. 80a
### FAILURE TO REGISTER AS INVESTMENT COMPANY

29.     Plaintiff re-alleges and reincorporates, as though fully set forth herein, each and every allegation above.

30.     Section 7(a) of the Investment Company Act ("ICA") precludes an "investment company" from selling its securities to greater than 100 investors unless it is registered under the ICA or falls within an exemption from the registration requirement.

31.     The ICA defines an "investment company" as "any issuer which . . . is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities." 15 U.S.C. 80a-3(a)(1)(A).

32.     Here, the Fund is an "issuer" because it sold limited partnership interests to investors.

33.     The Fund is also an "investment company" by virtue of making a Loan to the developer and taking a Note from the developer, and also taking a pledge of company interests as collateral. An EB-5 loan to a job creating entity is a security under the ICA.

34.     The Loan made by the Fund to the developer is secured by a pledge according to the PPM at pages 3 and 25, but this pledge may be subordinated to a senior lender:

██████████████████████████████████████
██████████████████████████████████████



35.   This means that the Loan is secured by ██████████████

████████████████.

36.   There are no real estate mortgages, no liens, and no real estate interests to secure the Loan.

37.   A pledge of securities is equivalent to a sale or purchase transaction. This rule was confirmed recently in *Rocky Aspen Management 204 LLC v. Hanford Holdings LLC*, 230 F. Supp. 3rd 159, 165-6 (S.D.N.Y. 2018) where the court said, "The Second Circuit and the Supreme Court have held that securities pledged to collateralize loan transactions are no longer mere loans and are subject to federal securities laws," citing *Rubin v. United States,* 101 S. Ct. 698, 702 (1981)("[t]he economic considerations and realities present when a lender parts with value and accepts securities as collateral for a loan are similar in important respects to the risk an investor undertakes when purchasing securities.") By taking a pledge of securities, the funds have effectively dealt in securities, and that makes them an investment company.

38.   Furthermore, when an EB-5 fund makes a loan, the loan is itself a security under the ICA, especially when evidenced by a Note. Here the Loan that the Fund made to developers was itself an "investment contract" because it was an investment of money in a common enterprise (the development of the projects) with

11

the expectation of profit (or at least some benefit and a nominal interest rate) derived from the work of others. See *Realex Capital Corporation*, SEC No-Action Letter (March 19, 1984)(*refusing* to give a no action letter to a fund that was a limited partner in various partnerships that owned and operate buildings, stating that the limited partnership investments ultimately rely on the work of others and therefore the LP was dealing in "investment contracts" and "securities," so it would have to register under the ICA).

39.     The Defendant entities were required to either register the Fund as an Investment Company or else find an exemption from registration. This was not a case where a fund inadvertently went over the magic number of 100 investors; there were **900** investors, many of whom could not read or write English.

40.     The most common exemptions to registration are the "private placement" sections 3(c)(1) and 3(c)(7) which apply to funds where the investors are all accredited investors and/or qualified purchasers. These are the exemptions used by virtually all hedge funds and private equity funds, who typically hire independent third party administrators to review each investor's assets. This is because under Rule 506 of Regulation D of the Securities Act of 1933, an issuer must take affirmative steps to ensure that all investors are accredited, and the issuer cannot simply rely on an investor's self-description.

41.     Here, the Defendants did not expressly claim an exemption under 3(c)(1) or 3(c)(7), nor can they: all they have is a self-description in English by the investor that he is accredited, and that is not enough under Regulation D.

42.     Like many other EB-5 funds, the Defendants may have assumed that

12

they came within a little-known and little-cited exemption to registration called 3(c)(5)(C) which provides an exception for: "Any person who is . . . primarily engaged in . . . purchasing or otherwise acquiring mortgages and other liens on and interests in real estate."

43.    The SEC interprets 3(c)(5)(C) to require that at least 55% of a fund's assets must consist of "mortgages and other liens on and interests in real estate" ("qualifying interests") and the remaining 45% of its assets consist primarily of real estate-type interests; at least 80% of its total assets consist of qualifying interests and real estate-type interests; and no more than 20% of its total assets consist of assets that have no relationship to real estate. *See*, e.g., *Salomon Brothers, Inc.*, SEC Staff No-Action Letter (June 17, 1985); *Citytrust*, SEC Staff No-Action Letter (Dec. 19, 1990); *Greenwich Capital Acceptance Inc.*, SEC Staff No-Action Letter (Aug. 8, 1991).

44.    Here there is only ██████, and in a recent No-Action Letter, the SEC stated that a pledged interest in another company **does not** constitute a qualifying asset under the 3c5C exemption because it is not a fully secured actual interest in real estate:

> We generally have taken the position that qualifying interests are assets that represent *an actual interest in real estate* or are loans or liens *fully secured by real estate*. Thus, we have not objected if an issuer treated as qualifying interests, among other assets, mortgage loans fully secured by real estate, fee interests in real estate, second mortgages secured by real property, deeds of trust on real property, installment land contracts and leasehold interests secured solely by real property. *In contrast, we generally have taken the position that an asset is not a qualifying interest for purposes of Section 3(c)(5)(C) if it is an*

13

> *interest in the nature of a security in another issuer engaged in the real estate business.*

*Great Ajax LLC Funding*, SEC Staff No-Action Letter (February 12, 2018)(taking the position that a fund which buys whole mortgages falls within the 3c5C exemption because its profit derives from the payment of principal and interest by the mortgagee).

45.     Even on the most basic level, each investor put in $550,000 and only got an LP capital contribution of $500,000 – so there is no way that their investment could be fully secured, since 10% of it was taken off the top as an administrative fee.

46.     The remedy for failure to register as an investment company is retroactive rescission of contracts entered into by the company, and a ban on the company engaging in interstate commerce. 15 U.S.C. 80a-46(b), 80a-7 and 80-8.

47.     Plaintiff is NOT asserting that he has a private right of action against a registered investment company for some violation of the internal requirements of the ICA, such as the failure of a registered investment company to file a quarterly report; rather, he is asserting that the Defendants failed completely to register.

WHEREFORE, Plaintiff ask this Court for an Order declaring that the Defendants should have registered the Fund as an investment company, and that the ICA grants Plaintiff the right of rescission.

14

**COUNT II**
**15 U.S.C. 78j (17 CFR. 240.10b-5)**
**FRAUDULENT MISPRESENTATION AND OMISSION**
**OF MATERIAL FACTS**

48.     Plaintiff re-alleges and reincorporates, as though fully set forth herein, each and every allegation above.

49.     Defendants assert that the limited partnership interests are not "securities" under federal law.  At p. 15 in the PPM, the Defendants flatly say: "The Partnership does not believe that the Units constitute "securities" within the meaning of the U.S. federal securities laws."

48.     The Defendants state in the PPM that they intend to rely on Rule 506 of Regulation D and Regulation S as exemptions from registration of securities, but they did NOT file a Form D for this private placement, even though the SEC flatly states on its web site that this is required:

> Form D is used to file a notice of an exempt offering of securities with the SEC. The federal securities laws require the notice to be filed by companies that have sold securities without registration under the Securities Act of 1933 in an offering made under Rule 504 or 506 of Regulation D or Section 4(a)(5) of the Securities Act. A company must file this notice within 15 days after the first sale of securities in the offering.

CMB has filed Form Ds for other private placements, but not for this one.  And that means that they did not disclose – as required by Form D – the compensation of all persons involved with sales of the securities.   Furthermore, Regulation S's Preliminary Notes say that Regulation S is unavailable to issuers that are

unregistered investment companies that are required to register (as in the case here, per Count I).

49.     The statement that the limited partnership interests are not "securities" is a blatant misrepresentation without any precedent – in fact, it cuts against precedents. The SEC shut down the Chicago Convention Center project in the Northern District as a fraudulent EB-5 project; they are in the process of prosecuting an attorney in the Northern District for EB-5 securities fraud; the Southern District in New York disbarred lawyers for acting as unlicensed broker-dealers under the federal securities laws; the SEC recently shuttered the EB-5 Jay Peak Resort in Vermont for securities fraud; the SEC sued in the Southern District of Florida for EB-5 fraud; they sued in district court in Idaho, where the governor himself went to China to tout EB-5 investments; the SEC has sued for securities fraud in EB-5 cases in California, New York, Illinois, Florida, and many other states. Every single case was for **securities** fraud. And the actions were brought by the **Securities** and Exchange Commission.

50.     In 2013, the SEC even issued an Investor Alert about EB-5 securities fraud entitled: "Investment Scams Exploit Immigrant Investor Programs." And courts have ruled that EB-5 investments – even at tiny profit margins – are still securities. See, e.g., *SEC v. Liu*, 262 F. Supp. 3rd 957 (C.D. Cal 2017)(holding that EB-5 interests are securities no matter how small the profit generated and regardless of the payment of an administrative fee).

51.     Despite all this, the Defendants insist that the limited partnership is not a security (see p. 53 and 54 of the PPM):

16

> The potential investment return, if any, on the Investor's $500,000
> Capital Contribution will be limited and is not expected to exceed
> approximately ▇% per year. The total dollar amount of investment
> return that the Investor may receive over the term of the loan will not
> exceed the $550,000 Subscription Price paid by the Investor. As a
> result, **the Investor will not earn a profit** on the Investor's total
> Subscription Price of $550,000. (emphasis added).

But this is directly contradictory to what the PPM says on the previous page, where

it asserts that the Fund can make all kinds of investments in search of profit (p. 52):



52.     The PPM then swings back the other way and says that the purpose of

the investment is to create jobs to qualify for immigration, not to build anything,

and that if the investments are "securities" they might face "significant liability"

and a "Material Adverse Effect," which is a buzzword for saying that it might

preclude the investors obtaining residence in the United States (p. 62).



17

53.   This digs a deeper hole.   On the one hand, if the investment is not a security and is simply to achieve an immigration benefit, then it is a so-called "Visa For Sale," which is illegal.   Furthermore, if the purpose is simply to create jobs, then this can be achieved by paying ten guys to put bricks in a pile – there is no reason for Hogan to draw so many fees from the Fund.

54.   On the other hand, if Defendants are indeed offering a security, then they are defrauding the investors by saying that the investors don't have the protection of the federal securities laws.   At p. 62 the PPM says: ████████

████████████████████████████████████████████████████

████████████████████████

55.   This investment is structured as a limited partnership, which is a classic type of security and falls within the definition of a security under federal law (in fact the definition of a security under the ICA is broader than that under the Exchange Act), and that means that the Defendants must disclose all material facts and may not omit to make any material disclosures.

55.   The fact that investors have the protection of the federal securities laws is a material fact, as is the actual amount that the foreign finders (who recruited the investors) are being paid.

56.   The attempt by Defendants to hide these from the investors is fraudulent and reckless; the investors have the right to know that they are protected by the securities laws and that the foreign finders who recommended this transaction were paid a particular amount.

18

57.    This fraud has caused damage to Plaintiff by delaying the bringing of this action, and it left them without key information that would have affected their investment decision.

WHEREFORE, Plaintiff asks this Court for an Order declaring that the limited partnership units issued by the Defendants are obviously securities and that the Defendants committed fraud by failing to notify the buyers that they had the protection of the federal securities laws, and failing to notify material facts such as the total fees paid to 'finders' and to Hogan and his affiliates.

## COUNT III
### 15 U.S.C. 78o
### UNREGISTERED BROKER-DEALER

58.    Plaintiff re-alleges and reincorporates, as though fully set forth herein, each and every allegation above.

59.    Section 15(a)(1) of the Exchange Act of 1934 makes it unlawful for a person to "effect a transaction in securities" or "attempt to induce the purchase or sale of any security" unless they are registered with FINRA as a broker-dealer.

60.    Section 29(b) of the Exchange Act provides that every contract made in violation of any provision of the broker-dealer registration requirements "shall be void." The voidable transaction gives the investor a right of rescission.

61.    Section 20(e) of the Exchange Act imposes aiding-and-abetting liability on any person that knowingly or recklessly provides substantial assistance in a violation of the Exchange Act.

62.    The Defendants are doing brokerage sales of securities from Illinois, even though they have set up a Swiss smokescreen.  The PPM says that the General Partner collects transaction-based fees on investors that they source, and share fees with their Swiss entity on fees from referred investors (p. 66):

> Each Investor subscribing to a Unit will pay the Subscription Price of $550,000.00, $500,000.00 of which shall constitute payment of the Capital Contribution and $50,000.00, or such lesser amount due to the charging of intermediary bank fees, of which shall constitute payment of the Syndication Price charged to each Investor. Upon satisfaction of the terms of the Escrow Agreement, the Capital Contribution of no less than $500,000 will be paid to the Partnership. The Syndication Price, will be paid to CMB GmbH from the Subscription Price paid by each Investor and released from the Escrow Account and deposited in an account designated by CMB GmbH. **Interest that has accrued on the Subscription Price, if any, shall be paid to the General Partner. . .**
> It is anticipated that the Syndication Price paid to CMB GmbH will be used by CMB GmbH, in its absolute and sole discretion, to cover costs of operation and possible profit pursuant to CMB GmbH's agreement with the General Partner and its Affiliates to, inter alia, act as a foreign sourcing entity for prospective Investors and to support the foreign finder network. Notwithstanding anything provided herein to the contrary,



The Swiss corporate registry lists Patrick F. Hogan of Rock Island as the manager of CMB Swiss and its holding company – so it appears that Hogan has set up the Swiss entity to collect brokerage fees overseas to avoid the appearance of being a broker-dealer under the Exchange Act.  In any event, some of the brokerage money is parked overseas, for reasons that will have to be explained later in this case.  On other CMB deals, Hogan is listed as a

"Promoter" on the Form D filed with the Securities and Exchange Commission, presumably to get him out of the definition of a broker under the so-called 'issuer exemption.' But that exemption only applies where the person receives no benefit for his brokerage, which Hogan cannot claim. So Hogan is a broker.

63.    There is really no way to describe the $50,000 fee (and interest thereon) other than as brokerage fee for finding an investor. There is no actual difference between the semantics of an "administrative fee," a 'syndication fee,' a 'finders fee' or 'broker fee.' Even if Hogan merely takes interest on a brokerage fee, he is still taking transaction-based compensation, which is brokerage.

63.    In other words, the General Partner is sourcing investors directly, which is classic brokerage activity; it is also sharing fees with an offshore broker, which is brokerage activity.

64.    In fact, officers of the Defendants went to China and invited investors to contact them directly in the United States to make purchase arrangements.

65.    Plaintiff's lawyer had a person in China make a telephone call to the Defendants, pretending to be interested in a transaction, and the employee of Defendant proceeded to market a project and solicit the investment directly.

66.    Hogan is using a Swiss entity to (attempt) to keep broker-dealer activity offshore, but they are splitting money with this entity, thereby aiding and abetting a failure to register as a broker-dealer.

67.    Hogan is also taking referrals from the Swiss entity that he manages. The definition section of the Limited Partnership Agreement says that the Swiss affiliate shall locate potential investors and then "refer the individual(s) to the

21

General Partner and its affiliates . . . CMB GmbH shall refer potential Investors to the General Partner and its Affiliates and support CMB GmbH's network of finders in the current offerings of the General Partner and its Affiliates." (see definition of "Syndicate Price").

68.    This is not only brokerage activity, it is also an attempt to avoid FINRA 2040(c) which requires that each investor solicited by a foreign finder must specifically agree in writing to the fees paid to the foreign finder.

69.    And the fees for brokerage are unconscionable: 10% up front, then the investor earns a maximum of ▇% of his $500,000 that remains, while the general partner earns a ▇% 'management fee' and a ▇% payment from the borrower on each advance from the Fund as a 'facility fee,' plus other fees, which means that Hogan is guaranteed in writing to make more than the investor.

70.    In a normal fixed-income investment, the brokerage fee is a fraction of what the investor can be expected to earn. Here, Hogan is guaranteed in writing to make 10% off the top plus make the same or higher return than the investor who puts in $550,000. This violates the duty of brokers to recommend only suitable investments given the investor's risk tolerance, need for liquidity, age, and situation. See FINRA Interpretive Letter to Brian Sweeny (August 26, 2013)(stating that EB-5 investments trigger broker-dealer requirements).

71.    Defendants are booking deals and selling units from the United States, and hoping to set up a smokescreen by having some of these referrals go through a Swiss affiliate that they manage, and through other unnamed 'finders' with whom they share unnamed transaction-based income. Despite 310 pages of documents,

Hogan has left out the key information that issuers and brokers need to give investors such as the exact compensation given to 'finders' who corral the Chinese investors into this Fund.

72.     In conclusion, Defendants put together a half-billion-dollar deal from non-accredited and unsophisticated foreigners, and to avoid detection they did not register the securities, they did not register as an investment company, they did not register an investment adviser, they did not register a broker-dealer, they moved around entities without updating the PPM or telling the investors key information. They wanted all the advantages of doing securities transactions in America but none of the obligations that come along with it.

WHEREFORE, Plaintiff asks this Court for an Order declaring that the Defendants should have registered as a broker-dealer, and their failure to do so gives Plaintiff the right of rescission.

Dated: July 11, 2018

Respectfully Submitted,

Douglas Litowitz
413 Locust Place
Deerfield, IL 60015
312-622-2848
Litowitz@gmail.com